J-S23046-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.S.M., A MINOR a/k/a D.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: G.T., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 809 EDA 2021 |

Appeal from the Order Entered April 14, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000529-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: D.S.M., A MINOR, a/k/a D.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: G.T., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 813 EDA 2021 |

Appeal from the Order Entered March 26, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000077-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: D.D.M., A MINOR, a/k/a/ D.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: G.T., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 814 EDA 2021 |

Appeal from the Order Entered April 14, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000527-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: D.D.M., A MINOR, a/k/a D.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

|  | : |  |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: G.T., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 815 EDA 2021 |

Appeal from the Order Entered March 26, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000075-2021

| IN THE INTEREST OF: D.R.M., A MINOR, a/k/a D.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: G.T., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 816 EDA 2021 |

Appeal from the Order Entered April 14, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000528-2019

| IN THE INTEREST OF: D.R.M., A MINOR, a/k/a D.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: G.T., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 817 EDA 2021 |

Appeal from the Order Entered March 26, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000076-2021

BEFORE:   LAZARUS, J., KUNSELMAN, J., and COLINS, J.[*]

---

[*] Retired Senior Judge assigned to the Superior Court.

MEMORANDUM BY LAZARUS, J.:          Filed: December 23, 2021

G.T. (Mother) appeals from the orders changing the permanency goal from reunification to adoption pursuant to 42 Pa.C.S.A. § 6351, and the decrees involuntarily terminating her parental rights[1] to her three children pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8) and (b).[2] Upon review, we find no abuse of discretion with respect to the change of goal orders and we agree with the trial court's finding that the Department of Human Services (DHS) established by clear and convincing evidence that termination was in the children's best interests. We rely upon the trial court's opinion, authored by the Honorable Joseph L. Fernandes, to affirm the orders and decrees.

Mother and D.M., Sr. (Father),[3] are the parents of three minor children: D.D.M. (born 9/16), D.R.M. (born 3/15), and D.S.M. (born 5/14) (Children). Following is an abbreviated timeline of the procedural and factual history of this case:

---

[1] This Court consolidated the appeals by order dated July 8, 2021. **See** Pa.R.A.P. 513.

[2] Mother has filed separate notices of appeal for each order in compliance with the Pennsylvania Supreme Court's decision in **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018). **See** Pa.R.A.P. 341(b). In **Walker**, the Court clarified that "the proper practice under Rule 341(a) is to file separate appeals from an order that resolves issues arising on more than one docket. The failure to do so requires the appellate court to quash the appeal." **Id.** at 977. **See also In the Matter of M.P.**, 204 A.3d 976, 981 (Pa. Super. 2019).

[3] Father's related appeals are docketed at Nos. 753-755 EDA 2021, No. 757 EDA 2021, No. 760 EDA 2021, and No. 762 EDA 2021. We have disposed of those appeals separately, at J-S23001-21.

**March 26, 2019:** DHS became involved with this family when a General Protective Services (GPS) report alleged Children were being neglected by their parents; that the home was dirty, malodorous, in generally poor condition, in need of several repairs, had potentially illegally utility connections, was possibly being resided in illegally, and lacked appropriate sleeping arrangement and food; that Father smoked marijuana and sold the family's Supplemental Nutritional Assistance Program (SNAP) benefits to purchase drugs; that neither of the [p]arents paid rent; that Mother did not change [D.D.M.'s] diaper in a timely manner; that the Children did not attend day care; that [D.S.M.] had developmental delays and a possible speech impediment; that both Parents were unemployed; that Mother received Department of Public Welfare (DPW) benefits; that Father suffered from untreated bipolar disorder; that two additional adults resided in the home; and that the family required a higher level of care than community-based Family Empowerment Services (FES) could provide. Report determined to be valid.

**March 28, 2019:** DHS visited the home and observed that: exterior of home was in poor condition; a first-floor window was covered with plywood; front door did not have an operable lock; ceiling was leaking and unstable; leak had caused water damage to the walls; there was a hole in the floor; a rear window had a broken glass pane filled with clothing; the refrigerator was covered in mold, contained no food, and was inoperable; only 3-4 cans of food sat in the kitchen cabinets; the kitchen sink had no water connection; Children slept on old cushions on the floor; and home was cluttered with trash, clothing and animal feces. DHS informed Mother that the home was not appropriate for Children and asked if there were any family resources who could care for them while repairs were completed. Father arrived home, became irate and verbally threatened DHS. Father attempted to enter DHS's vehicle but was restrained by neighbors. DHS contacted the Philadelphia Police, who were dispatched to the home. Children's Paternal Grandmother arrived at the home and stated she would be able to temporarily care for the Children, but that they could not stay on an extended basis because she lived in a senior living facility. DHS developed a one-night safety plan for the Children, where they would reside with Paternal Grandmother.

**March 29, 2019:** DHS investigated other family members for possible kinship placement and ultimately determined a Family Friend as a possible resource. Family Friend's home, upon investigation, had all operable utilities, ample space and food, and

appropriate sleeping arrangements for each of the Children. Family Friend was willing and able to care for Children. DHS completed criminal and ChildLine clearances for Family Friend and household members and obtained an Order of Protective Custody (OPC) for Children and placed them with Family Friend.

**April 1, 2019:** Court held shelter care hearing. Mother was referred to Behavioral Health System (BHS) for consult and evaluation.

**April 9, 2019:** Children were adjudicated dependent based on present inability to provide proper parental care and control and committed to DHS custody. Mother was referred to Achieving Reunification Center (ARC) for appropriate services, including housing.

**May 10, 2019:** Community Umbrella Agency (CUA) held initial single case plan (SCP) meeting. Mother did not participate. Each child's goal was listed as reunification. Mother's objectives were: comply with needed services and court orders; attend BHS for mental health evaluation and comply with recommendations; comply with ARC for parenting education and housing assistance; and, attend supervised visitation with Children.

**June 26, 2019:** Court held review hearing. Mother did not attend. Children were ordered to remain in Family Friend's home, and kinship care had been implemented.

**July 30, 2019:** Court held permanency review hearing. Mother did not attend. Court found Mother had not been attending ARC, nor her ordered BHS evaluation. Mother had visited Children three times since placement. Mother was again referred to ARC for services, and to BHS for consultations and evaluation. Court ordered visitation remain supervised in the Family Friend's (kinship) home, with addition of CUA supervising once per month.

**October 22, 2019:** Court held permanency review hearing. Mother did not attend. Mother was ordered to continue ARC. Children remained as committed and placed and visitation changed to weekly, supervised visits at DHS.

**February 18, 2020:** Court held review hearing. Mother did not attend. Children ordered to remain as committed and placed. Court ordered guardian *ad litem* (GAL) be appointed for children.[4]

**July 28, 2020:** Court held permanency review hearing. Mother attended. Mother found minimally compliant. Mother was again referred to BHS for consultation and evaluation, and again ordered to attend parenting education through ARC. Court ordered CUA to assist Mother with housing, attending workshops at ARC, and ensuring Mother participated in SCP meeting. Visitation supervised virtual due to COVID-19 pandemic, to be changed to bi-weekly supervised two-hour visit in the community after pandemic restrictions were lifted. Court also ordered CUA explore voluntary relinquishment with Mother. All Children received trauma therapy.

**September 21, 2020:** Mother participated in psychological tele-evaluation. Mother was diagnosed with adjustment disorder with mixed anxiety and depressed mood, and persistent depressive disorder. Recommendations including weekly outpatient therapy and monitoring for need for psychotropic medication.

**December 15, 2020:** Court held permanency review hearing. Mother attended hearing. Court found Mother minimally compliant with SCP, moderate progress made toward alleviating circumstances necessitating Children's placement. Mother and Father refused to disclose current address. The court again referred Mother to BHS and ordered her to provide proof of employment or benefits received. Bi-weekly supervised visitation at DHS continued. Court appointed legal counsel for Children. *See supra* at n. 4.

**January 6, 2021:** SCP revised. Two of the three children's permanency goals changed to adoption; remaining child's alternate/concurrent goal identified as adoption. Mother's

---

[4] The trial court appointed Lisa Visco, Esquire, as GAL and Terry Blynn, Esquire, as legal counsel for Children. *See* N.T. Termination Hearing, 3/26/21, at 4; *see also* 23 Pa.C.S.A. § 2313(a) (children have statutory right to counsel in contested involuntary termination proceedings) and *In re K.R.*, 200 A.3d 969 (Pa. Super. 2018) (en banc), *but see In Re: T.S.*, *E.S.*, 192 A.3d 1080, 1092 (Pa. 2018) ("During contested termination-of-parental-right proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests.").

objectives included: complying with needed services and court orders; attending BHS evaluation and complying with recommendation; complying with ARC for parenting and housing assistance; attending supervised visitation/virtual visitation with Children; and, continuing attendance a Men and Women of Excellence for therapy.

**February 12, 2021:** DHS filed petitions to involuntarily terminate Mother's parental rights and change all Children's goals to adoption.

Trial Court Opinion, 5/17/20, at 2-5.

On March 26, 2021, the court held a goal change/termination hearing. Mother and Father were both present, with counsel, as were Children's GAL and legal counsel. Mother did not testify.

Following the hearing, the court entered orders changing the goal to adoption for all Children and final decrees terminating Mother's parental rights to Children pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act.[5] Mother timely filed the instant appeal. Both Mother and the trial court complied with Pa.R.A.P. 1925. Mother raises the following issues for our review:

1. Whether the trial court erred by terminating the parental rights of [M]other pursuant to 23 Pa.C.S.A. § 2511(a)(1) without clear and convincing evidence of [M]other's intent to relinquish her parental claim or refusal to perform her parental duties?

2. Whether the trial court erred by terminating the parental rights of [M]other pursuant to 23 Pa.C.S.A. § 2511(a)(2) without clear and convincing evidence of [M]other's present incapacity to perform parental duties?

---

[5] 23 Pa.C.S.A. §§ 2101-2938.

- 7 -

3. Whether the trial court erred by terminating the parental rights of [M]other pursuant to 23 Pa.C.S.A. § 2511(a)(5) without clear and convincing evidence to prove that reasonable efforts were made by [DHS] to provide [M]other with additional services and that the conditions that led to placement of the [Children] continue to exist?

4. Whether the trial court erred by terminating the parental rights of [M]other pursuant to 23 Pa.C.S.A. § 2511(a)(8) without clear and convincing evidence that the conditions that led to placement of the [Children] continue to exist when [M]other presented evidence of compliance with the goals and objectives of her family service plan?

5. Whether the trial court erred by terminating the parental rights of [M]other pursuant to 23 Pa.C.S.A. § 2511(b) without clear and convincing evidence that there is no parental bond between [M]other and [Children] and termination would serve the best interest[s] of [Children]?

Appellant's (Termination) Brief, at 7.

1. Whether the trial court erred by changing the permanency goal to adoption pursuant to 42 Pa.C.S.A. § 6351 without clear and convincing evidence that adoption is in the [Children's] best interest[s]?

2. Whether the trial court erred by hanging the permanency goal to adoption pursuant to 42 Pa.C.S.A. § 6351 without clear and convincing evidence of reasonable efforts made by [DHS] to reunify the [Children] with [M]other?

3. Whether the trial court erred by changing the permanency goal to adoption in contravention of the mandate of 42 Pa.C.S.A. § 6302 to preserve the unity of the family whenever possible?

Appellant's (Goal Change) Brief, at 7.

Our standard of review in cases involving the termination of parental rights is well-settled:

[It] requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision [] should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts[, which] often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted). The termination of parental rights is governed by section 2511 of the Adoption Act, which requires a two-step analysis. First, the party seeking termination must prove by clear and convincing evidence that the parent's conduct meets at least one of the grounds for termination set forth in section 2511(a). *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007).

Here, the court found termination was appropriate on the following grounds:

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of

- 9 -

time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

(b) Other considerations. — The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §§ 2511(a)(2), (5), (8), and (b).

After our review, we conclude DHS proved by clear and convincing evidence that the statutory grounds for termination under section 2511(a)(2) were met.[6]

DHS obtained protective custody of Children in March of 2019 due to inadequate food and shelter, general safety concerns, and concerns about parents' substance abuse and mental health. CUA caseworker Tiffany Wilson

---

[6] We may affirm the court's termination order under any single subsection of section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004); *In re J.E.*, 745 A.2d 1250 (Pa. Super. 2000).

testified there was no food in the house, and that there was mold in the refrigerator and in the sink. N.T. Goal Change/Termination Hearing, *supra* at 10. "It was a squatter house. There was a hole in the roof, so water was leaking in." *Id.* Wilson testified that Children, who ranged in age from four to six, were not up to date with medical or dental care and were not enrolled in school. *Id.* at 11. The Children have remained in DHS protective custody since March 2019 and were placed with Family Friend (foster parent). At the time of the termination hearing, Children had been with foster parent for approximately two years. *Id.* at 13.

CUA Caseworker Wilson testified that Children look to foster parent (who they refer to as "Mom-mom") to meet their basic needs, that they are safe, and that they have a healthy, parental bond with foster parent. *Id.* at 36-49. Additionally, she stressed that Children are thriving:

> I've been on the case since day one. I've met the children They could barely form sentences and that is –[D.S.M., the oldest child,] couldn't [] form a full sentence. [He] has conversations with me now. He pays attention in school. I mistakenly thought he was autistic because of this lack of communication[,] and I was wrong. I was gratefully wrong. But it was just the neglect. The progress these children have made in [foster parent's] home, to me, is extraordinary.

*Id.* at 50 (emphasis added).

Forensic Social Worker Roya Paller interviewed Children and testified that each of them "want their forever home to be [with] Mom-mom[.]" *Id.* at 101. Tito Valdez, City Solicitor, testified on behalf of DHS. Valdez

- 11 -

emphasized that Children have been in DHS custody since March of 2019, but noted:

> This is not a case where we're alleging or believe in any way that [Father] or [Mother] do not love their children. We believe sincerely that they do love them. But, unfortunately, there were a set of dependency issues that existed in March 2019, that have not sufficiently been addressed. At this juncture, the testimony from the social worker that's been on the case since the case opened, Your Honor, I believe – I would submit to the court was beyond credible, is that she would not be in a position to even recommend unsupervised visitation, let alone reunification, particularly given that we, [] still do not know where the parents reside. There are [] outstanding PCEs. And there has been some engagement since the last court date because there was a matter-of-fact conversation about voluntary relinquishments of parents rights. But at this juncture, the status of those objectives are pending because the parents chose not to engage in the services, since they've been ordered by this court and . . . recommended by CUA in the single case plan since the case opened. That's a choice they made. And, unfortunately, the dependency issues remain, and these children deserve permanency. They deserve stability. They deserve a parent and caregiver that understands that parenting isn't something that can be held in abeyance, and the beauty of this case is that they have that in [foster parent].

*Id.* at 105-06.

Under Section 2511(a)(2), it must be established that there has been repeated and continued incapacity, abuse, neglect, or refusal which has caused the child to be without essential parental care, control, or subsistence, and that the causes of this incapacity, abuse, neglect, or refusal cannot or will not be remedied. *In re Adoption of J.J.*, 515 A.2d 883, 889 (Pa. 1986). Mother argues there is no clear and convincing evidence establishing her incapacity, and she contends all the conditions that contributed to the neglect

of the Children have been remedied. Appellant's Brief, at 10. This argument is belied by the record.

The record establishes that, at the time of the hearing, Mother still had not completed her SCP objectives. Although Mother did avail herself of a BHS evaluation, this did not occur until eighteen months into the life of the case. N.T. Goal Change/Termination Hearing, *supra* at 31, 73. CUA Case Manager Wilson testified that she could not recommend unsupervised visitation or reunification due to Mother's unresolved mental health issues. Mother was diagnosed with adjustment disorder, mixed with depressive disorder and anxiety, *id.* at 32, and it was recommended Mother attend individual therapy and that the therapist determine whether medication was warranted. *Id.* at 32. However, Mother did not continue with treatment past the intake appointment. *Id.* Wilson also testified that she did observe an improvement in Mother's compliance, but this did not occur until nearly two years into the case, in fact, just two months prior to the termination hearing. *Id.* at 30. Mother's belated efforts were insufficient to justify continued uncertainty for Children. When a child is placed in foster care, the parent has an affirmative duty to work toward the child's return. *In re Julissa O.*, 746 A.2d 1137, 1141 (Pa. Super. 2000). Moreover, this "affirmative duty," requires the parent to demonstrate willingness to cooperate with the agency to obtain the rehabilitative services necessary for the performance of parental duties and responsibilities. *Id.* Notably, Mother never progressed beyond bi-weekly supervised visitation, and her consistency with visitation was approximately

65% throughout the life of the case. N.T. Termination/Goal Change Hearing, *supra* at 33, 70. Finally, and critical to DHS's safety assessment, Mother refused to provide the address of her current residence. *Id.* at 7, 16-17, 72-73.

We agree with the trial court's assessment that Mother had "ample time, opportunity[,] and [services] to put her in a position to adequately parent and care for Children, but her repeated and continued incapacity has not been mitigated." Trial Court Opinion, *supra* at 10. Essentially, the testimony presented at the hearing demonstrated Mother's unwillingness to work to improve and remedy the causes of her incapacity to parent, and to "provide Children with the essential parental care, control, and subsistence necessary for their physical and mental well-being." *Id.* The evidence clearly demonstrated that Mother failed to take critical steps toward meeting her SCP objectives. Consequently, we find no abuse of discretion in the court's determination to terminate Mother's parental rights to Children pursuant to subsection (a)(2). *See In re T.S.M.*, *supra*; *In re L.M.*, *supra*; 23 Pa.C.S.A. § 2511(a)(2).

Termination was also proper under section 2511(b) where: (1) evidence suggests Mother's behavior during visitation was "somber" and the CUA Case Manager observed Mother "almost not knowing what to say to them and . . . how to engage them." N.T. Termination/Goal Change Hearing, *supra* at 33-34; (2) CUA Case manager could not safely recommend Mother obtain unsupervised visitation or reunification, *id.* at 34; (3) Mother was inconsistent

with visitation until two weeks prior to termination hearing, *id.* at 96; (4) CUA case manager testified Children would not suffer permanent or irreparable harm if Mother's parental rights were terminated, *id.* at 39, 45, 49; (5) Children had no emotional reaction when visits with Mother ended and, instead at the end of the last visit, Children ran to foster parent's car, *id.* at 39, 44-45, 49; (6) Children had developed healthy bonds with foster parent; and, (7) Children need permanency and stability in their lives. *See* Trial Court Opinion, *supra* at 14-16. The court found that the evidence established that there was a bond between Children and foster parent, and that Mother "has not created a healthy parental bond between herself and Children." *Id.* at 16. The record supports this determination.

In her final three issues, Mother challenges the court's goal-change orders. Because we have concluded that the trial court did not abuse its discretion in granting the petition to terminate Mother's parental rights, these issues are moot. *Interest of A.M.*, 256 A.3d 1263, 1272-73 (Pa. Super. 2021) (citing Interest of D.R.–W., 227 A.3d 905, 917 (Pa. Super. 2020)). *See also In re H.S.W.C.-B*, 836 A.2d 908, 911 (Pa. 2003) (holding that orders granting or denying goal changes, as well as orders terminating or preserving parental rights, are final and appealable when entered and remain in effect until overturned on appeal, or rendered moot by a subsequent order).[7]

_____

[7] Even if we were to address these issues, we would find no error or abuse of discretion. *In the Interest of L.T.*, 158 A.3d 1266, 1276 (Pa. Super. 2017). *(Footnote Continued Next Page)*

The parties are directed to attach a copy of Judge Fernandes' Rule 1925(a) opinion in the event of further proceedings in the matter.

Orders and decrees affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/23/21

---

Here, the trial court correctly disposes of Mother's claims with regard to changing the goals to adoption where: 1) Children have been in DHS care for two years; (2) DHS made reasonable efforts to identify, locate, work with, and provide services to Mother to aide in the reunification process; (3) Mother was uncooperative with DHS, particularly with respect to completing her mental health treatment and disclosing to DHS her current address, which prevented CUA from assessing the home for potential reunification; (4) Mother's progress toward her goals was "minimal" over two years, never progressing beyond supervised visits with Children; (5) the forensic social worker reported Children wanted to remain with their "Mom-mom (foster mother);" and (6) Children are thriving in their foster home. *See* Trial Court Opinion, 5/17/21, at 16. Children are in a safe and stable environment and "look to their foster mother to meet their needs and the parental bond is between children and their foster mother, rather than with Mother." *Id.* "The record establishes by clear and convincing evidence that termination would not sever[] an existing bond and beneficial relationship with Mother." *Id.* The court emphasized that because "there is no healthy or apparent remaining bond to preserve, it is in Children's best interests to terminate Mother's parental rights and so be freed for adoption." *Id.*

Received 6/19/2021 1:20:33 PM Circulated 12/20/2021e02:52 PM

Filed 6/19/2021 1:20:00 PM Superior Court Eastern District
809 EDA 2021

# IN THE COURT OF COMMON PLEAS
# FOR THE COUNTY OF PHILADELPHIA
# FAMILY COURT DIVISION

| | | |
|---|---|---|
| In the Interest of D.D.M., a Minor<br>a/k/a D.M., a Minor | : | CP-51-DP-0000527-2019<br>CP-51-AP-0000075-2021 |
| | : | |
| In the Interest of D.R.M., a Minor<br>a/k/a D.M., a Minor | : | CP-51-DP-0000528-2019<br>CP-51-AP-0000076-2021 |
| | : | |
| In the Interest of D.S.M., a Minor<br>a/k/a D.M., a Minor | : | CP-51-DP-0000529-2019<br>CP-51-AP-0000077-2021 |
| | : | |
| | : | FID:   51-FN-000528-2019 |
| | : | |
| APPEAL OF: G.T., Mother | : | 814 EDA 2021 |
| | : | 815 EDA 2021 |
| | : | 816 EDA 2021 |
| | : | 817 EDA 2021 |
| | : | 809 EDA 2021 |
| | : | 813 EDA 2021 |
| | : | |

## OPINION[1]

**Fernandes, J.:**

Appellant G.T. ("Mother") appeals from the orders entered on March 26, 2021 granting the petitions filed by the Philadelphia Department of Human Services ("DHS"), to involuntarily terminate Mother's parental rights to D.D.M. ("Child 1"), D.R.M. ("Child 2"), and D.S.M. ("Child 3") (collectively "Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. §2511(a)(2), (5), (8) and (b), and to change each Child's permanency goal from reunification to adoption, pursuant to 42 Pa.C.S.A. §6351. Lawrence O'Connor, Esquire, counsel for Mother ("Mother's Counsel") filed timely Notices of Appeal with a Statement of Matters Complained of on Appeal pursuant to Rule 1925(b) on April 14, 2021.

---

[1] The trial court requested the Notes of Testimony for March 26, 2021, on March 29, 2021. The trial court issued a second request for the Notes of Testimony on April 15, 2021. The trial court issued a third request for the Notes of Testimony on April 29, 2021. The Notes of Testimony for March 26, 2021 were received on April 30, 2021.

**Factual and Procedural Background:**

DHS initially became involved with this family on March 26, 2019, when a General Protective Services ("GPS") report alleged: that Children were being neglected by their parents; that the home was dirty, malodorous, in generally poor condition, in need of several repairs, had potentially illegal utility connections, was possibly being resided in illegally, and lacked appropriate sleeping arrangements and food; that Father smoked marijuana and sold the family's Supplemental Nutritional Assistance Program ("SNAP") benefits to purchase drugs; that neither of the Parents paid rent; that Mother did not change Child 1's diaper in a timely manner; that the Children did not attend day care; that Child 3 suffered from developmental delays and a possible speech impediment; that both Parents were unemployed; that Mother received Department of Public Welfare ("DPW") benefits; that Father suffered from untreated bipolar disorder; that two additional adults resided in the home; and that the family required a higher level of care than community-based Family Empowerment Services ("FES") could provide. The report was determined to be valid.

DHS visited the home on March 28, 2019. DHS observed: that the exterior of the home was in poor condition; that a first-floor window was covered with plywood; that the front door did not have an operable lock; that the ceiling was leaking and unstable; that the leak had caused water damage to the walls; that there was a hole in the floor; that a rear window had a broken glass pane filled with clothing; that the refrigerator was covered in mold, contained no food, and was inoperable; that only 3-4 cans of food sat in the kitchen cabinets; that the kitchen sink had no water connection; that the Children slept on old cushions on the floor; and that the home was cluttered with trash, clothing and animal feces. Mother informed DHS that the home's water registered high lead levels and that the Department of Licenses and Inspection had filed a lawsuit against the homeowner to make the appropriate repairs. DHS informed Mother that the home was not appropriate for Children and asked if there were any family resources who could care for them while repairs were completed. Father arrived home, became irate and verbally threatened DHS. Father attempted to enter DHS's vehicle but was restrained by neighbors. DHS contacted the Philadelphia Police, who were dispatched to the home. Children's Paternal Grandmother arrived at the home and stated she would be able to temporarily care for the Children, but that they could

not stay on an extended basis because she lived in a senior living facility. DHS developed a one-night safety plan for the Children, where they would reside with Paternal Grandmother.

On March 29, 2019, DHS investigated other family members for possible kinship placement. Children's adult Half-Sibling was not deemed an appropriate resource. Half-Sibling named a Family Friend as a possible resource. Family Friend's home, upon investigation, had all operable utilities, ample space and food, and appropriate sleeping arrangements for each of the Children. Family Friend was willing and able to care for Children. DHS completed criminal and ChildLine clearances for Family Friend and all household members. DHS obtained an Order of Protective Custody ("OPC") for Children and placed them with Family Friend.

On April 1, 2019, at the shelter care hearing, the court lifted the OPC and ordered the Children's temporary commitment to DHS to stand. Mother was referred to Behavioral Health System ("BHS") for consultations and/or evaluations. Visitation was ordered to be supervised by a male worker at the Agency.

On April 9, 2019, an adjudicatory hearing was held[2] for the Children. The court discharged the temporary commitment, and all three Children were adjudicated dependent based on present inability to provide proper parental care and control. Children were committed to the custody of DHS. Mother was referred to the Achieving Reunification Center ("ARC") for appropriate services, including housing. Visitation was changed to allow for visitation in the kinship home, to be supervised by the caregiver, Family Friend. Mother did not attend this hearing.

On May 10, 2019, the Community Umbrella Agency ("CUA") held an initial single case plan ("SCP") meeting. Each Child's goal was listed as reunification with parents. Mother's objectives were to comply with the needed services and court orders, attend Behavioral Health Service ("BHS") for a mental health evaluation and comply with all recommendations, comply with ARC for parenting education and housing assistance, and attend supervised visitation with the Children. Mother did not participate in the meeting.

---

[2] Honorable Vincent W. Furlong oversaw this case between April 1, 2019, and February 18, 2020. Honorable Joseph L. Fernandes oversaw the case from July 28, 2020, until present.

On June 26, 2019, the court held a review hearing. Mother did not attend. Children were ordered to remain in Family Friend's home, and the court found kinship care had been implemented.

On July 30, 2019, the court held a permanency review hearing. Mother did not attend. The court found that Mother had not been attending ARC, nor had she attended her ordered BHS evaluation. Mother had visited the Children three times. Placement continued to be necessary and appropriate, so Children were ordered to remain as committed and placed. Mother was again referred to ARC for appropriate services, and again referred to BHS for consultations and evaluation. Visitation remained as supervised in the kinship home, with the addition of CUA supervising once per month. CUA was also ordered to provide a report of the Children's lead levels at the next hearing.

On October 22, 2019, the court held a permanency review hearing. Mother did not attend. Mother was ordered to continue attending ARC. Children were to remain as committed and placed. Visitation was changed to weekly supervised visits at the agency.

On February 18, 2020, the court held a review hearing. Mother did not attend. Children were ordered to remain as committed and placed. The court also ordered a best interests Guardian ad Litem ("GAL") be appointed for the Children.

On July 28, 2020, the court held a permanency review hearing. Mother attended this hearing. Mother was found minimally compliant with her SCP. All Children received trauma therapy. Medication management was recommended for Child 2. Child 1 was diagnosed as being on the autism spectrum. All Children received services through Elwyn. Mother was again referred to BHS for consultation and evaluation, and again ordered to attend parenting education through ARC. The court ordered CUA to assist Mother with housing, attending workshops at ARC, and ensure Mother participated in SCP meetings. The court ordered visitations would be supervised virtual visits due to the COVID-19 pandemic, to be changed to bi-weekly supervised two-hour visits in the community after the pandemic restrictions were lifted. The court also ordered that CUA explore voluntarily relinquishment with Mother.

Mother participated in a tele-psychological evaluation on September 21, 2020. The evaluation diagnosed Mother with adjustment disorder with mixed anxiety and depressed mood, and

persistent depressive disorder ("dysthymia"). Recommendations included participating in weekly outpatient therapy with the therapist monitoring need for psychotropic medication. follow-up with a primary care physician to ascertain any ongoing medical difficulties and address weight concerns. and continuing to comply with court orders and CUA requests.

On December 15, 2020. the court held a permanency review hearing. Mother attended this hearing. The court found Mother minimally compliant with her SCP with moderate progress made toward alleviating the circumstances necessitating Children's placement. Mother and Father refused to disclose their current address. Child 2 and Child 3 were diagnosed as suffering from post-traumatic stress disorder ("PTSD") and attention-deficit hyperactivity disorder ("ADHD"). Child 3 was prescribed medication. The court again referred Mother to BHS. Mother was also ordered to provide proof of employment or benefits received. Visitation was noted as biweekly supervised visits at the agency. The court appointed TPR legal counsel for Children.

The SCP was revised on January 6, 2021. Child 2 and Child 3's permanency goals were changed to adoption. and Child 1's alternate/concurrent goal was identified as adoption. Mother's objectives included complying with needed services and court orders. attending a BHS evaluation and complying with all recommendations. complying with ARC for parenting and housing assistance. attending supervised visitation/virtual visitation with all Children. and continuing to attend Men and Women of Excellence for therapy.

All Children have been in DHS care since March 28, 2019. At the time of the termination and goal change hearing. Children had been in care for approximately twenty-four months. Mother has failed to complete her objectives and comply with court orders throughout the life of the case. Mother has also failed to demonstrate she is able to safely and appropriately care for the Children. DHS filed petitions to involuntarily terminate Mother's parental rights and change all Children's goals to adoption on February 12, 2021. On March 26, 2021. the court held the termination and goal change trial for all Children. The trial court heard testimony from the CUA Case Manager. Father. and an additional forensic social worker. Mother attended the trial but did not testify. The testimony from CUA and the social worker was credible. DHS requested the trial court terminate Mother's rights under 23 Pa.C.S.A. §2511(a)(1). (2). (5). (8). and (b). The trial court found clear and convincing evidence to change the Children's goals to adoption. pursuant to 42 Pa.C.S.A.

§6351. and terminate Mother's parental rights. pursuant to 23 Pa.C.S.A. §2511(a)(2). (5). (8). and (b).

**Discussion[3]:**

On appeal of the involuntarily termination of Mother's parental rights and goal change. Mother avers for each Child that:

1. The evidence was insufficient for the Court to find. by clear and convincing evidence. to change the goal to adoption [and terminate parental rights] under 2511(a).
2. The evidence was insufficient for the Courts (sic) to find. by clear and convincing evidence. that adoption [and termination of Mother's parental rights] best serves the child's physical and emotional needs and the welfare (sic) under 2511(b).

The grounds for involuntary termination of parental rights are enumerated in the Adoption Act at 23 Pa.C.S.A. §2511(a). which provides the following grounds for §2511(a)(2):

(a) **General rule** - The rights of a parent. in regard to a child. may be terminated after a petition is filed on any of the following grounds:

(2) The repeated and continued incapacity. abuse. neglect or refusal of the parent has caused the child to be without essential parental care. control or subsistence necessary for [her] physical or mental well-being and the conditions and causes of the incapacity. abuse. neglect or refusal cannot or will not be remedied by the parent.

In proceedings to involuntarily terminate parental rights. the burden of proof is on the party seeking termination. which must establish the existence of grounds for termination by clear and convincing evidence. *In re Adoption of Atencio*. 650 A.2d 1064. 1066 (Pa. 1994). The clear and convincing standard means the evidence "is so clear. direct. weighty. and convincing as to enable the trier of fact to come to a clear conviction. without hesitation. of the truth of the precise facts in issue."

---

[3] Mother is discussed throughout the transcript. however testimony specifically regarding Mother occurs largely from pages 29 to 40 and pages 70 to 77. Mother is also discussed briefly on pages 42-45. 48-49. 95. 96. and finally between pages 111 and 113. Father also filed a Notice of Appeal of termination of his parental rights under EDAs 753. 754. 755. 757. 760. and 762 of 2021. A separate opinion will be filed on Father's appeal.

*Matter of Sylvester*, 555 A.2d 1202, 1203-1204 (Pa. 1989). §2511(a)(2) is not limited to affirmative misconduct. It may include acts of refusal to perform parental duties, as well as incapacity to perform those duties. *In re A.D.*, 93 A.3d 888, 895-896 (Pa. Super. 2014). Further, adequate parenting requires action, not simply intent. *In re A.L.D.*, 797 A.2d 326, 340 (Pa. Super. 2002) (quoting *In re J.W.*, 578 A.2d 952, 959 (1990)). Parents must also make diligent efforts to resume assumption of full parental responsibilities within a reasonably prompt period. *In re A.D., supra.* This section focuses on the child's present and future need for essential parental care, control, or subsistence necessary for their physical or mental well-being. *In re Adoption of M.J.H.*, 501 A.2d 648, 654 (Pa. Super. 1985). While there may not be an explicit list of required and specific parental duties, at minimum a child needs love, protection, guidance, and support. *In re K.Z.S.*, 946 A.2d 737, 759 (Pa. Super. 2008). A passive interest in the child is not enough; rather a parent must fulfill their obligation through affirmative performance by utilizing all available resources and exercise reasonable firmness in resisting obstacles. *Id.* Even if a parent demonstrates love for their child or makes efforts to perform their duties, if a parent's incapacity cannot be remedied within a reasonable period, their parental rights may be terminated. *In re Adoption of M.J.H., supra.*

Children have been involved with DHS since late March 2019, with the CUA Case Manager assigned in April 2019. (N.T. 03/26/21, pg. 9). Mother's SCP objectives throughout the life of the case were to: attend ARC for parenting, employment, and housing, attend a BHS evaluation and comply with recommendations, and engage in visitation. (N.T. 03/26/21, pgs. 29, 70; DHS Exhibits 4-6). Mother was aware of her objectives. (N.T. 03/26/21, pg. 13).

The CUA Case Manager testified that she could not recommend unsupervised visitation or reunification for Mother due to the mental health piece of Mother's SCP. (N.T. 03/26/21, pg. 34). Mother did avail herself for a BHS evaluation, but not until September 2020, eighteen- months into the life of the case. (N.T. 03/26/21, pgs. 31, 73). The CUA Case Manager testified that the evaluation diagnosed Mother with adjustment disorder, mixed with anxiety and depressed mood, and depressive disorder. (N.T. 03/26/21, pg. 32). The evaluation recommended that Mother attend individual therapy and the therapist should determine any medication needs. (N.T. 03/26/21, pg. 32). However, because Mother did not continue past an intake appointment, there was never an assessment for psychotropic medication. (N.T. 03/26/21, pg. 32). The CUA Case Manager testified

that Mother did not engage in any further mental health treatment. (N.T. 03/26/21, pgs. 31-32). The CUA Case Manager referred Mother to one location, where Mother did attend an intake session. (N.T. 03/26/21, pg. 31). After the intake, Mother determined the location was not ideal for her as they seemed more focused on drugs and alcohol issues.[4] (N.T. 03/26/21, pgs. 31, 74-75). The CUA Case Manager then provided Mother with two additional mental health treatment options. (N.T. 03/26/21, pgs. 31, 74-75). Mother alleged both locations did not get back to her and the Case Manager did not learn of any further engagement by Mother after requesting Mother attempt to engage at providers referred by CUA. (N.T. 03/26/21, pgs. 31, 74-75). Beyond the BHS evaluation and an intake session, Mother did not participate in any mental health treatment throughout the life of the case. (N.T. 03/26/21, pgs. 31, 74-75).

Mother did complete her parenting objective in February 2021 by competing a 12-week program. (N.T. 03/26/21, pgs. 29, 75-76). However, Mother had been previously referred three times throughout the life of the case. (N.T. 03/26/21, pg. 29). Mother did not complete the parenting objective with enough time remaining in her case to utilize the learned skills and demonstrate parenting capability. (N.T. 03/26/21, pg. 30). The CUA Case Manager testified that after a "very hard conversation" about voluntary relinquishment, she observed an improvement in Mother's compliance with her objectives, but this did not occur until approximately two months prior to the termination trial, nearly two years into the case. (N.T. 03/26/21, pg. 30). Mother also completed a housing program through ARC. (N.T. 03/26/21, pg. 75). The CUA Case Manager testified that Mother no longer resides in the home the Children were removed from, but she was not given an opportunity to see and assess Mother's current home. (N.T. 03/26/21, pgs. 72-73). Mother and Father refused to provide their current location and have not been forthcoming with any information regarding their current living arrangements. (N.T. 03/26/21, pgs. 7, 16-17, 72-73). There was no testimony regarding whether Mother completed an employment program through ARC, but the CUA Case Manager did testify that Mother never provided any information about a source of income. (N.T. 03/26/21, pg. 34).

Mother never graduated beyond biweekly visits supervised at the agency. (N.T. 03/26/21, pgs. 33,

---

[4] Mother was referred to mental health providers that also provide drug and alcohol services. The mental health providers are able to provide mental health therapy only without the individual having any drug and alcohol issues.

95). The CUA Case Manager stated that Mother's consistency with visitation was about 65% throughout the life of the case. (N.T. 03/26/21, pgs. 33, 70). Her visits with Children were "somber" and the Case Manager observed Mother "almost not knowing what to say to them and...how to engage them." (N.T. 03/26/21, pgs. 33-34). The CUA Case Manager did not feel she was in a position to safely recommend Mother obtain unsupervised visitation or reunification with Children. (N.T. 03/26/21, pg. 34). The CUA Case Manager also testified that "there really was no reason" behind Mother's inconsistency in visitation. (N.T. 03/26/21, pg. 96). Mother received public transportation tokens and passes prior to the COVID-19 pandemic, but remained inconsistent with both in-person and virtual visitation until approximately two weeks prior to the termination trial. (N.T. 03/26/21, pg. 96). The CUA Case Manager testified that CUA has a policy where the Case Manager takes over supervision, rather than having other staff supervise visits, when parents are noncompliant; the Case Manager for this family had to continue personally supervising visits until two weeks prior to the termination trial due to Mother's noncompliance. (N.T. 03/26/21, pg. 96).

Throughout the life of the case, Mother has been minimally to moderately compliant with her SCP objectives. Mother has failed to successfully complete and attend her mental health therapy, provide an address to have her home assessed, provide income verification, and consistently attend her supervised visitation. (N.T. 03/26/21, pgs. 29-33, 70-76). Mother attended only three court hearings during the two-years prior to the termination trial. The conditions and causes of Mother's incapacity have not and will not be remedied by Mother within a reasonable period of time. The CUA Case Manager testified that Mother's parenting capacity is lacking in order to supervise and keep Children safe. (N.T. 03/26/21, pg. 51). Children received trauma therapy at Children's Crisis Treatment Center ("CCTC"), but Mother has not inquired about their services. Mother did attend a meeting to discuss medication for Child 2, but refused to sign consent forms for the medication. (N.T. 03/26/21, pgs. 37-38, 42-44). When the Children came into DHS care, they were behind in medical and dental care. Children were also not enrolled in school. (N.T. 03/26/21, pg. 11). Their foster parent has ensured that the Children are up to date on their medical and dental needs, including making them enroll in school with Individual Education Plans ("IEPs"). (N.T. 03/26/21, pgs. 40-41, 47-48, 50). Children were adjudicated dependent on April 9, 2019. Children had been in DHS care for nearly twenty-four months at the time of the termination trial on March 26, 2021.

Mother was inconsistent with her attendance at court hearings but was aware of her SCP objectives. Mother had ample time, opportunity, and offered help to put herself in a position to adequately parent and care for Children, but her repeated and continued incapacity has not been mitigated. Mother is unable to meet Children's basic needs. The testimony of the CUA Case Manager and the forensic social worker were credible. Mother has demonstrated an unwillingness to work to improve and remedy the causes of her incapacity to parent in order to provide Children with the essential parental care, control, and subsistence necessary for their physical and mental well-being. Termination under 23 Pa.C.S.A. §2311(a)(2) was proper.

Mother also appeals the trial court's termination of parental rights under 23 Pa.C.S.A. §2511(a)(5), which permits termination when a child was removed, by court or voluntary agreement, and placed with an agency if, for at least six months, the conditions which led to the placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services reasonably available to the parent are not likely to remedy the conditions leading to placement, and termination best serves the child's needs and welfare. DHS, as a child and youth agency, cannot be required to extend services beyond the period of time deemed as reasonable by the legislature or be subjected to herculean efforts. A child's life cannot be put on hold in hope that the parent will summon the ability to handle the responsibilities of parenting. *In re J.T.*, 817 A.2d 505, 509 (Pa. Super. 2001). As a consequence, Pennsylvania's Superior Court has recognized that a child's needs and welfare require agencies to work toward termination of parental rights when a child has been placed in foster care beyond reasonable temporal limits and after reasonable efforts for reunification have been made by the agency, which have been ineffective. This process should be completed within eighteen months. *In re N.W.*, 851 A.2d 501, 508 (Pa. Super. 2004).

Children had been in DHS care for nearly twenty-four months at the time of the termination trial on March 26, 2021, since their adjudication on April 9, 2019. Mother's SCP objectives included attending ARC for housing, employment, and parenting classes, avail herself for a BHS evaluation and comply with recommendations, and visitation. (N.T. 03/26/21, pgs. 29, 70; DHS Exhibits 4-6). Mother was referred to ARC at least three times, but did not complete any programing until shortly before the termination trial. (N.T. 03/26/21, pg. 29). While Mother did complete a 12-week

parenting course, this SCP objective was not completed until February 2021. (N.T. 03/26/21, pgs. 39, 75-76). Mother also completed at housing class through ARC but no testimony was provided as to when this occurred. (N.T. 03/26/21, pg. 75). While Mother is no longer residing in the home Children were initially removed from, Mother has not provided any information regarding her current living arrangement. (N.T. 03/26/21, pgs. 72-73). CUA was never able to see or conduct an assessment of Mother's new residence to determine safety and clearance for the home. (N.T. 03/26/21, pgs. 72-73). There was no testimony regarding whether Mother completed an employment program through ARC, but the CUA Case Manager did testify that Mother never provided any information about a source of income. (N.T. 03/26/21, pg. 34). Mother also availed herself for a BHS evaluation but did not comply with the recommendations. Mother completed her BHS evaluation on September 21, 2020, which recommended individual therapy. (N.T. 03/26/21, pgs. 31-32, 73-75). Mother attended an intake appointment at one mental health provider following her BHS evaluation, but felt the location was not ideal for her needs. (N.T. 03/26/21, pgs. 31-32, 73-75). The CUA Case Manager provided Mother with two additional provider locations from which to seek treatment, but despite encouragement to engage on multiple occasions, Mother did not obtain mental health treatment throughout the life of the case. (N.T. 03/26/21, pgs. 31-32, 74-75). Mother's compliance with visitation throughout the life of the case was approximately 65%, according to the CUA Case Manager testimony. (N.T. 03/26/21, pgs. 33, 70). Mother would frequently not show up to visits at all, show up late, or cancel visits entirely. (N.T. 03/26/21, pg. 96). The CUA Case Manager was unsure why Mother was noncompliant with visitation as Mother was provided with public transportation passes prior to the COVID-19 pandemic and the visitation became virtual thereafter. (N.T. 03/26/21, pg. 96). When visitation did occur, Mother was never inappropriate, but the CUA Case Manager described the visits as "somber" and observed Mother "almost not knowing what to say to them and...how to engage them." (N.T. 03/26/21, pgs. 33-34, 71). The CUA Case Manager testified that the visits were "not substantive...they're a visit...they're visits." (N.T. 03/26/21, pg. 71). After a conversation about voluntarily relinquishment of parental rights, the CUA Case Manager observed an improvement in Mother's compliance, but this did not occur until approximately twenty-two months into the life of the case. (N.T. 03/26/21, pg. 30). Mother never graduated beyond biweekly visits supervised at the agency. (N.T. 03/26/21, pgs. 33, 95-96). The CUA Case Manager has made reasonable efforts to assist

Mother in obtaining proper services to help her parent and be reunified with her Children. As a result of Mother's noncompliance and lack of a healthy parental bond with Children, the trial court found that termination of Mother's parental rights was in the best interest of Children for their overall well-being. (N.T. 03/26/21, pgs. 111-113, 117). Mother is unable or unwilling to remedy the conditions that led to Children's placement and termination best serves their needs and welfare. Children's lives cannot be put on hold in the hope that Mother will summon the ability to handle the responsibilities of parenting. Because the trial court made these determinations on the basis of clear and convincing evidence, termination under 23 Pa.C.S.A. §2511(a)(5) was proper.

The trial court also terminated Mother's parental rights under 23 Pa.C.S.A. §2511(a)(8), which permits termination when:

> The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

This section does not require the court to evaluate a parent's willingness or ability to remedy the conditions which initially caused placement or the availability or efficacy of DHS services offered to the parent, only the present state of the conditions. *In re: Adoption of K.J.*, 936 A.2d 1128, 1133 (Pa. Super. 2007). The party seeking termination must prove by clear and convincing evidence that the termination is in the best interest of the child. The best interest of the child is determined after consideration of the needs and welfare of the child such as love, comfort, security, and stability. *In re Bowman*, 647 A.2d 217, 219 (Pa. Super. 1994). See also *In re Adoption of T.T.B.*, 835 A.2d 387, 397 (Pa. Super. 2003).

Children had been in DHS care for nearly twenty-four months at the time of the termination trial on March 26, 2021, since their adjudication on April 9, 2019. Mother's SCP objectives included attending ARC for housing, employment, and parenting classes, avail herself for a BHS evaluation and comply with recommendations, and visitation. (N.T. 03/26 21, pgs. 29, 70; DHS Exhibits 4-6). Mother was referred to ARC at least three times, but did not complete any programing until shortly before the termination trial. (N.T. 03/26/21, pg. 29). While Mother did complete a 12-week

parenting course, this SCP objective was not completed until February 2021. (N.T. 03/26/21, pgs. 29, 75-76). Mother also completed at housing class through ARC but no testimony was provided as to when this occurred. (N.T. 03/26/21, pg. 75). While Mother is no longer residing in the home Children were initially removed from, Mother has not provided any information regarding her current living arrangement. (N.T. 03/26/21, pgs. 72-73). CUA was never able to see or conduct an assessment of Mother's new residence to determine safety and clearance for the home. (N.T. 03/26/21, pgs. 72-73). There was no testimony regarding whether Mother completed an employment program through ARC, but the CUA Case Manager did testify that Mother never provided any information about a source of income. (N.T. 03/26/21, pg. 34). Mother also availed herself for a BHS evaluation but did not comply with the recommendations. Mother completed her BHS evaluation on September 21, 2020, which recommended individual therapy. (N.T. 03/26/21, pgs. 31-32, 73-75). Mother attended an intake appointment at one mental health provider following her BHS evaluation, but felt the location was not ideal for her needs. (N.T. 03/26/21, pgs. 31-32, 73-75). The CUA Case Manager provided Mother with two additional provider locations from which to seek treatment, but despite encouragement to engage on multiple occasions, Mother did not obtain mental health treatment. (N.T. 03/26/21, pgs. 31-32, 74-75). Mother's compliance with visitation throughout the life of the case was approximately 65%, according to the CUA Case Manager testimony. (N.T. 03/26/21, pgs. 33, 70). Mother would frequently not show up to visits at all, show up late, or cancel visits entirely. (N.T. 03/26/21, pg. 96). The CUA Case Manager was unsure why Mother was noncompliant with visitation as Mother was provided with public transportation passes prior to the COVID-19 pandemic and the visitation became virtual thereafter. (N.T. 03/26/21, pg. 96). When visitation did occur, Mother was never inappropriate, but the CUA Case Manager described the visits as "somber" and observed Mother "almost not knowing what to say to them and…how to engage them." (N.T. 03/26/21, pgs. 33-34, 71). The CUA Case Manager testified that the visits were "not substantive…they're a visit…they're visits." (N.T. 03/26/21, pg. 71). After a conversation about voluntarily relinquishment of parental rights, the CUA Case Manager observed an improvement in Mother's compliance, but this did not occur until approximately twenty-two months into the life of the case. (N.T. 03/26/21, pg. 30). Mother never graduated beyond biweekly visits supervised at the agency. (N.T. 03/26/21, pgs. 33, 95-96). The CUA Case Manager has made reasonable efforts to assist Mother in obtaining proper services to

help her parent and be reunified with her Children. Children received trauma therapy at Children's Crisis Treatment Center ("CCTC"), but Mother has not inquired about their services. Mother did attend a meeting to discuss medication for Child 2, but refused to sign consent forms for the medication. (N.T. 03/26/21, pgs. 37-38, 42-44). When the Children came into DHS care, they were behind in medical and dental care. Children were also not enrolled in school. (N.T. 03/26/21, pg. 11). Their foster parent has ensured that the Children are up to date on their medical and dental needs, including making them enroll in school with Individual Education Plans ("IEPs"). (N.T. 03/26/21, pgs. 40-41, 47-48, 50). As a result of Mother's noncompliance and lack of a healthy parental bond with Children, the trial court found that termination of Mother's parental rights was in the best interest of Children for their overall well-being. (N.T. 03/26/21, pgs. 111-113, 117). Mother is unable or unwilling to remedy the conditions that led to Children's placement and termination best serves their needs and welfare. The CUA Case Manager testified that Mother's parenting capacity is lacking in order to supervise and keep Children safe. (N.T. 03/26/21, pg. 51). Mother did not complete her SCP objectives within a reasonable period of time and what objectives were completed were done so more than twelve months after Children entered care. Given the Mother has not been willing to provide any information as to her living arrangements, there can be no assessment as to whether the initial living conditions that contributed to Children's placement have been remedied. Because the trial court made these determinations on the basis of clear and convincing evidence, termination under 23 Pa.C.S.A. §2511(a)(8) was proper.

After a finding of any grounds for termination under Section (a), the court must, under 23 Pa.C.S.A. §2511(b), also consider what - if any - bond exists between parent and child. *In re Involuntary Termination of C.W.S.M. and K.A.L.M.*, 839 A.2d 410, 415 (Pa. Super. 2003). The trial court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship". *In re Adoption of T.B.B.* 835 A.2d 387, 397 (Pa. Super. 2003). In assessing the parental bond, the trial court is permitted to rely upon the observations and evaluations of social workers. *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008). The trial court must determine that the bond between a parent and a child cannot be in only one direction. There must be a bilateral relationship that roots from a parent's willingness to learn appropriate parenting skills and ability to provide stability to the child. *In re K.K.R.-S.*, 958 A.2d 529, 534 (Pa. Super. 2008). Additionally, a bond is not just a positive relationship between a child

and a parent. Being a parent means assuming responsibility so that a real bond develops, not just a casual relationship. Children have the ability to know, love, and sometimes have an enjoyable time with a parent that have little to do with their upbringing. *In re J.L.C.*, 837 A.2d 1247, 1249 (Pa. Super. 2003). In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis depends on the circumstances of the particular case. *Id.* However under 23 Pa.C.S.A. §2511(b), the rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, or medical care, if found to be beyond the control of the parent. The trial court should consider the best interest of the child as it exists presently, rather than the facts at the time of the original petition.

Mother has not been consistently compliant with visitation and never graduated beyond biweekly visits supervised at the agency. (N.T. 03/26/21, pgs. 33, 95). The CUA Case Manager stated that Mother's consistency with visitation was about 65% throughout the life of the case. (N.T. 03/26/21, pgs. 33, 70). Her visits with Children were "somber" and the Case Manager observed Mother "almost not knowing what to say to them and…how to engage them." (N.T. 03/26/21, pgs. 33-34). The CUA Case Manager did not feel she was in a position to safely recommend Mother obtain unsupervised visitation or reunification with Children. (N.T. 03/26/21, pg. 34). The CUA Case Manager also testified that "there really was no reason" behind Mother's inconsistency in visitation. (N.T. 03/26/21, pg. 96). Mother received public transportation tokens and passes prior to the COVID-19 pandemic, but still remained inconsistent in both in-person and virtual visitation until approximately two weeks prior to the termination trial. (N.T. 03/26/21, pg. 96). The CUA Case Manager testified that CUA has a policy where the Case Manager takes over supervision, rather than having other staff supervise visits, when parents are noncompliant; the Case Manager for this family had to continue personally supervising visits until two weeks prior to the termination trial due to Mother's noncompliance. (N.T. 03/26/21, pg. 96). The CUA Case Manager testified that none of the three Children would suffer permanent or irreparable harm if Mother's parental rights were terminated. (N.T. 03/26/21, pgs. 39, 45, 49). None of the Children had emotional reactions when visits ended and their relationships with Mother showed a lack of connection. (N.T. 03/26/21, pgs. 39, 44-45, 49). Instead at the end of the last visit, all Children ran to their foster mother's car. (N.T. 03/26/21, pg. 49). The CUA Case Manager testified that Children had

developed healthy and parental bonds with their resource parents. (N.T. 03/26/21, pgs. 39, 45, 49). Mother did not inquire with the CUA Case Worker as to the services received by Child 1. (N.T. 03/26/21, pg. 38). Mother did participate in a medication meeting for Child 2, but Mother did not consent to the medication despite court approval and doctor recommendation. (N.T. 03/26/21, pgs. 42-44). Mother was involved in an IEP meeting for Child 3, although no testimony was provided as to whether Mother participated in an IEP meeting for Child 2. (N.T. 03/26/21, pgs. 41-42, 48, 77). However, apart from a medication management meeting, Mother has not engaged in trauma therapy or autism services received by any of the Children. (N.T. 03/26/21, pgs. 38, 42-42, 47). The CUA Case Manager testified that the Children have made "extraordinary" progress in their foster home. (N.T. 03/26/21, pg. 50). The CUA Case Manager testified that upon first meeting the Children, Child 3 in particular was unable to form full sentences and she mistakenly believed him to be on the autism spectrum. (N.T. 03/26/21, pg. 50). Now, Child 3 is able to have conversations with the CUA Case Manager. (N.T. 03/26/21, pg. 50). When Children's TPR legal counsel spoke with Children, Child 3 reportedly stated: "I don't miss my parents anymore." (N.T. 03/26/21, pg. 98). The forensic social worker testified that all Children reported wanting to remain with their "Mom-mom," which is how they refer to their foster mother. (N.T. 03/26/21, pgs. 45-46, 101). Children also look to their foster mother to meet their needs and the parental bond is between Children and their foster mother, rather than with Mother. (N.T. 03/26/21, pg. 100). The CUA Case Manager testified that Children cannot be safely returned to Mother. (N.T. 03/26/21, pg. 34). Children have been in foster care placement for approximately twenty-four months and the trial court found that the parental bond is between Children and foster parents, not between Children and Mother. (N.T. 03/26/21, pg. 113). Mother has not created a healthy parental bond between herself and Children. (N.T. 03/26/21, pg. 113). Because there is no healthy or apparent remaining bond to preserve, it is in Children's best interests to terminate Mother's parental rights and so be freed for adoption. (N.T. 03/26/21, pg. 113). The record establishes by clear and convincing evidence that termination would not severe an existing bond and beneficial relationship with Mother. Mother is unable to provide stability and safety to Children and does not have parental bonds with any of the Children. Mother was inconsistent and often noncompliant with her visitation. The trial court's termination of Mother's parental rights to Children under 23 Pa.C.S.A. §2511(b) was proper.

Mother also asserts that the court erred in changing Child's permanency goal from reunification to adoption. Pursuant to 42 Pa.C.S.A. §6351, when considering a petition to change a dependent child's goal, the trial court must consider, *inter alia*:

(1) the continuing necessity for and appropriate of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal of the child; (5) a likely date by which the goal might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty two months.

*In re A.B.*, 19 A.3d 1084, 1088-1089 (Pa. Super. 2011). In a change of goal proceeding, the child's best interest must be the focus of the trial court's determination. The child's safety and health are paramount considerations. *In re A.H.*, 763 A.2d 873, 877 (Pa. Super. 2000). Pennsylvania's Juvenile Act recognizes family preservation as one of its primary purposes. *In the Interest Of R.P. a Minor*, 957 A.2d 1205, 1220 (Pa. Super. 2008). As a result, welfare agencies must make efforts to reunify the biological parents with their child. Nonetheless, if those efforts fail, the agency must redirect its efforts toward placing the child in an adoptive home. Agencies are not required to provide services indefinitely when a parent is unwilling or unable to apply the instructions received. *In re R.T.*, 778 A.2d 670, 681 (Pa. Super. 2001). A child's life cannot be put on hold in the hope that parent will someday summon the ability to handle and assume the responsibilities of being a parent. *In re A.B.*, 19 A.3d at 1089. The trial court should consider the best interest of the child as it exists presently, rather than the facts at the time of the original petition.

Children had been in DHS care for nearly twenty-four months at the time of the termination trial on March 26, 2021, since April 9, 2019. Mother's SCP objectives included attending ARC for housing, employment, and parenting classes, avail herself for a BHS evaluation and comply with recommendations, and visitation. (N.T. 03/26/21, pgs. 29, 70; DHS Exhibits 4-6). Throughout the life of the case, Mother was referred to ARC at least three times. (N.T. 03/26/21, pg. 29). While she eventually completed a parenting course and a housing program, it is unknown when the housing program took place, and the parenting course was completed twenty-two months into the

life of the case. (N.T. 03/26/21, pgs. 29. 75-76). CUA connected Mother with three separate mental health providers to aid in completion of her mental health objective, but Mother never attended more than one intake visit at a single provider. Mother completed her BHS evaluation on September 21. 2020. which recommended individual therapy. (N.T. 03/26/21, pgs. 31-32. 73-75). Mother has also not been fully compliant with visitation throughout the life of the case and never graduated beyond biweekly visits supervised at the agency. (N.T. 03/26/21, pgs. 33, 95). The CUA Case Manager stated that Mother's consistency with visitation was about 65% throughout the life of the case. (N.T. 03/26/21, pgs. 33. 70). Her visits with Children were "somber" and the Case Manager observed Mother "almost not knowing what to say to them and…how to engage them." (N.T. 03/26/21, pgs. 33-34). While the CUA Case Manager testified to an increase in overall compliance after a conversation regarding voluntarily relinquishment of parental rights. this improvement did not occur until approximately twenty-two months into the case. (N.T. 03/26/21. pg. 30). Finally. while Mother is no longer residing in the home Children were initially removed from. Mother has not provided any information regarding her current living arrangement. (N.T. 03/26/21. pgs. 72-73). CUA was never able to see or conduct an assessment of Mother's new residence to determine whether it is appropriate. safe. and stable. (N.T. 03/26/21. pgs. 72-73). The living arrangements of the home was a key factor in the removal of Children from parents' care. and Mother was unwilling to provide CUA with any information regarding her current housing situation. (N.T. 03/26/21. pgs. 10. 72-73). The CUA Case Manager testified that none of the three Children would suffer permanent or irreparable harm if Mother's parental rights were terminated. (N.T. 03/26/21, pgs. 39. 45. 49). None of the Children had emotional reactions when visits ended and their relationships with Mother showed a lack of connection. (N.T. 03/26 21. pgs. 39. 44-45. 49). Instead at the end of the last visit. all Children ran to their foster mother's car. (N.T. 03/26/21. pg. 59). The CUA Case Manager testified that Children had developed healthy and parental bonds with their resource parents. (N.T. 03/26 21. pgs. 39. 45. 49). The CUA Case Manager testified that the Children have made "extraordinary" progress in their foster home. (N.T. 03/26/21. pg. 50). The CUA Case Manager testified that upon first meeting the Children. Child 3 in particular was unable to form full sentences and she mistakenly believed him to be on the autism spectrum. (N.T. 03/26/21. pg. 50). Now. Child 3 is able to have conversations with the CUA Case Manager. (N.T. 03/26/21. pg. 50). When Children's TPR legal counsel spoke with Children. Child 3 reportedly

stated: "I don't miss my parents anymore." (N.T. 03/26/21, pg. 98). The forensic social worker testified that all Children reported wanting to remain with their "Mom-mom," which is how they refer to their foster mother. (N.T. 03/26/21, pgs. 45-46, 101). Children also look to their foster mother to meet their needs and the parental bond is between Children and their foster mother, rather than with Mother. (N.T. 03/26/21, pg. 100). The CUA Case Manager testified that Children cannot be safely returned to Mother. (N.T. 03/26/21, pg. 34). Children have been in foster care placement for approximately twenty-four months and the trial court found that the parental bond is between Children and foster parents, not between Children and Mother. (N.T. 03/26/21, pg. 113). Mother has not created a healthy parental bond between herself and Children. (N.T. 03/26/21, pg. 113). Children are in a stable environment with their foster parents. They have formed a positive bond with their "Mom-mom." They have made substantial improvement in the twenty-four months they have been in care. Children would not suffer any irreparable. Children need permanency in a safe environment, which Mother cannot provide. The CUA Case Manager testified that Mother's parenting capacity is lacking in order to supervise and keep Children safe. (N.T. 03/26/21, pg. 51). The record established by clear and convincing evidence that the trial court's change of permanency goals from reunification to adoption was proper. The goal change to adoption should be affirmed.

**Conclusion:**

For the aforementioned reasons, the trial court found that DHS met its statutory burden by clear and convincing evidence regarding termination of Mother's parental rights to Children pursuant to 23 Pa.C.S.A. §2511(a)(2), (5), (8) and (b); and changing each Child's goal from reunification to adoption pursuant to 42 Pa.C.S.A. §6351. The trial court's termination of Mother's parental rights and changing of each Child's goal was proper and should be affirmed.

By the court.

_____

Joseph Fernandes J.

# IN THE COURT OF COMMON PLEAS
# FOR THE COUNTY OF PHILADELPHIA
# FAMILY COURT DIVISION

| | | |
|---|---|---|
| In the Interest of D.D.M., a Minor | : | CP-51-DP-0000527-2019 |
| | : | CP-51-AP-0000075-2021 |
| In Interest of D.R.M., a Minor | : | CP-51-DP-0000528-2019 |
| | : | CP-51-AP-0000076-2021 |
| In the Interest of D.S.M., a Minor | : | CP-51-DP-0000529-2019 |
| | : | CP-51-AP-0000077-2021 |
| | : | |
| | : | FID: 51-FN-000528-2019 |
| | : | |
| APPEAL OF: G.T., Mother | : | 814 EDA 2021 |
| | : | 815 EDA 2021 |
| | : | 816 EDA 2021 |
| | : | 817 EDA 2021 |
| | : | 809 EDA 2021 |
| | : | 813 EDA 2021 |

## CERTIFICATE OF SERVICE

I hereby certify that this court is serving a copy of this duly executed Opinion upon all parties or their counsel on <u>May 17, 2021</u>. The names and addresses of all persons served are as follows:

A.Bennette Harrison, Esq.
City of Philadelphia Law Department
1515 Arch Street, 16th Floor
Philadelphia, Pennsylvania 19102
a.bennette.harrison@phila.gov

Lisa Visco, Esq.
206 N 22nd Street, Unit B
Philadelphia, Pennsylvania 19103
viscolaw@gmail.com

Deborah Fegan, Esq.
1800 JFK Blvd, Suit 300
Philadelphia, Pennsylvania, 19103
dfegan@aol.com

Lawrence O'Connor, Esq.
2301 Cherry Street, Suite 6A
Philadelphia, Pennsylvania, 19103-1061
larry.oconnoresq.com

Terry Blynn, Esq.
30 S 15th Street, 15th Floor
Philadelphia, Pennsylvania 19102
tblynn4170@gmail.com

BY: _____

Sabine A. Glocker, Esq.
Law Clerk to the Hon. Joseph L. Fernandes
First Judicial District of Pennsylvania
T: (215) 686-2660 | sabine.glocker@courts.phila.gov

Page 1 of 1